**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2116**

———————

LULA WILLIAMS; GLORIA TURNAGE; GEORGE HENGLE; DOWIN COFFY; MARCELLA P. SINGH, Administrator of the Estate of Felix M. Gillison, Jr., on behalf of themselves and all individuals similarly situated,

        Plaintiffs – Appellees,

   v.

MATT MARTORELLO,

        Defendant – Appellant,

   and

BIG PICTURE LOANS, LLC; ASCENSION TECHNOLOGIES, INC.; DANIEL GRAVEL; JAMES WILLIAMS, JR.; GERTRUDE MCGESHICK; SUSAN MCGESHICK; GIIWEGIIZHIGOOKWAY MARTIN,

        Defendants.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Robert E. Payne, Senior District Judge.  (3:17-cv-00461-REP)

———————

Argued:  October 28, 2022                       Decided:  January 24, 2023

———————

Before GREGORY, Chief Judge, and AGEE and DIAZ, Circuit Judges.

———————

Affirmed by published opinion. Judge Agee wrote the opinion in which Chief Judge Gregory and Judge Diaz joined.

---

**ARGUED:** Bernard R. Given, II, LOEB & LOEB LLP, Los Angeles, California, for Appellant. Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellees. **ON BRIEF:** William N. Grosswendt, Los Angeles, California, John D. Taliaferro, LOEB & LOEB LLP, Washington, D.C., for Appellant. Kristi C. Kelly, Andrew J. Guzzo, KELLY GUZZO PLC, Fairfax, Virginia; Gregory A. Beck, GUPTA WESSLER PLLC, Washington, D.C.; Leonard A. Bennett, Craig C. Marchiando, CONSUMER LITIGATION ASSOCIATES, P.C., Newport News, Virginia; Beth E. Terrell, Elizabeth A. Adams, Jennifer R. Murray, TERRELL MARSHALL LAW GROUP PLLC, Seattle, Washington; James W. Speer, VIRGINIA POVERTY LAW CENTER, Richmond, Virginia; John G. Albanese, Eleanor M. Drake, BERGER & MONTAGUE, P.C., Minneapolis, Minnesota; Michael A. Caddell, CADDELL & CHAPMAN, Houston, Texas, for Appellees.

---

2

AGEE, Circuit Judge:

This class-action proceeding relates to a lending scheme allegedly designed to circumvent state usury laws. Matt Martorello appeals from three district court rulings that (1) reconsidered prior factual findings based on a new finding that Martorello made misrepresentations that substantially impacted the litigation, (2) found that the plaintiffs-appellees—Virginia citizens who took out loans (the "Borrowers")—did not waive their right to participate in a class-action suit against him, and (3) granted class certification.

In particular, Martorello argues that the district court violated the mandate rule by making factual findings related to the misrepresentations that contradicted this Court's holding in the prior appeal and then relying on those factual findings when granting class certification. He also contends that the Borrowers entered into enforceable loan agreements with lending entities in which they waived their right to bring class claims against him. In addition, he asserts that common issues do not predominate so as to permit class treatment in this case.

As explained below, we disagree with Martorello. We conclude that the district court did not violate the mandate rule and that the Borrowers did not waive the right to pursue the resolution of their dispute against him in a class-action proceeding. Finally, we conclude that the district court did not abuse its discretion in granting class certification because common issues predominate. Accordingly, we affirm the rulings of the district court.

I.

3

The Lac Vieux Desert Band of Chippewa Indians (the "Tribe") purportedly created businesses under tribal law to make small-dollar, high-interest-rate loans to consumers via the internet.[1] The Borrowers allege that the Tribe did so alongside Martorello as part of a "Rent-a-Tribe" scheme in which a payday lender partners with a Native American tribe to cloak the lender in the sovereign immunity of the tribe, thereby precluding enforcement of otherwise applicable usury laws that cap interest rates.

A.

As an initial step of this alleged scheme, the Tribe enacted a Tribal Consumer Financial Services Code (the "Code") to govern a new consumer lending program. The Code created the Tribal Financial Services Regulatory Authority (the "Authority") to implement the Code. The Authority's powers included licensing entities to engage in certain consumer financial services ("Licensees"); determining whether Licensees violated the Code; and disciplining Licensees through possible fines, sanctions, license suspensions, and license revocations.

In addition to complying with the Code, Licensees were to comply with applicable tribal and federal law and to conduct business "in a manner consistent with principles of federal consumer protection law." J.A. 3090. Nonetheless, the Code stated that the

---

[1] For example, named Plaintiff Lula Williams borrowed $800 from Big Picture Loans, LLC. According to her loan agreement, she was charged an annual percentage rate of 649.8095%, meaning that she would incur a combined interest and principal debt of $6,200 after making all repayments as scheduled.

Authority "in no way waived any defenses or position related to the applicability of the above laws to the Tribe or any Financial Services Licensee." *Id.*

Section 9 of the Code created the Tribal Dispute Resolution Procedure ("TDRP") under which a consumer could raise a complaint with a Licensee. If the consumer was dissatisfied with the Licensee's response, he or she could request review by the Authority. In turn, the Authority could hold a hearing and issue a written decision "grant[ing] or deny[ing] any relief as [it] determine[d] appropriate." *Id.* at 3097. The consumer could then appeal to the Tribal Court which could reverse and remand the Authority's decision if that court concluded that the decision "conflict[ed] with Tribal law or the Tribal Constitution[.]" *Id.* at 3098. But any decision by the Tribal Court could not be appealed: "[u]pon issuance of the Tribal Court's opinion and order, a consumer's administrative remedies are exhausted." *Id.*

B.

After the enactment of the Code, the Tribe and/or Martorello created Red Rock Tribal Lending, LLC ("Red Rock"), which began making consumer loans in January 2012. The facts related to the creation and operation of Red Rock are disputed, but the parties agree that Red Rock contracted with Bellicose VI, LLC ("Bellicose")—an entity owned by Martorello—to provide services related to the lending in exchange for a portion of Red

5

Rock's income.[2] The Borrowers allege that Martorello was essentially running Red Rock during this initial phase.

In the same time frame, litigation and government enforcement actions against "Rent-a-Tribe" lenders began to increase. The Borrowers allege that Martorello became concerned about his exposure to liability, so the parties restructured the lending operations with a goal that all involved entities would be covered by the Tribe's sovereign immunity. To accomplish that goal, the Tribe divided Red Rock into two entities—Big Picture Loans, LLC ("Big Picture") and Ascension Technologies ("Ascension") (collectively, the "Entities")—to operate the lending business. The Tribe then purchased another entity, Bellicose Capital (which was the parent company of SourcePoint), from its parent company, Eventide, in a seller-financed deal in which Eventide provided a loan to the Tribe to be repaid over seven years of variable repayments.[3] The Borrowers contend that even after this restructuring, Martorello "continued to keep almost all the profits . . . while retaining substantial control of the lending operation through Eventide." Response Br. 9.

## C.

Consumer loans were made using standardized agreements between the Borrowers and Red Rock or Big Picture (the "Loan Agreement"). The Loan Agreement contained the

---

[2] Bellicose later assigned its rights under this contract to its affiliate SourcePoint VI, LLC ("SourcePoint"). Martorello had an ownership interest in SourcePoint via his ownership interest in its parent, Bellicose Capital.

[3] Eventide was "managed and majority-owned by multiple entities of which Martorello was the president." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 175 (4th Cir. 2019).

following "GOVERNING LAW AND FORUM SELECTION" provision ("Governing Law provision"):

> This Agreement will be governed by the laws of the [Tribe] ("Tribal law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the [TDRP] set forth in Section 9 of the Code and summarized below for Your convenience.

J.A. 1936 (capitalization in original). Elsewhere, the Loan Agreement reiterated the TDRP's general process as outlined in the Code and explained that consumer complaints must "be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner." *Id.* at 1937.

The Loan Agreement also contained a waiver provision in which the Borrower agreed that (1) he or she consented to the jurisdiction of the Tribe and agreed to be bound solely by the TDRP; and (2) he or she gave up the right to serve as a representative and to participate as a member of a class of claimants in any lawsuit filed against the lender "AND/OR RELATED THIRD PARTIES." *Id.* (capitalization in original). The Borrower acknowledged that all disputes against the lender and related third parties must be resolved by the TDRP "only on an individual basis . . . as provided for pursuant to Tribal law" and that "NO LITIGATION OR ARBITRATION IS AVAILABLE AND NO JUDGE OR ARBITRATOR SHALL CONDUCT CLASS PROCEEDINGS[.]" *Id.* (capitalization in original). This waiver provision was binding on the lender "and related third parties." *Id.*

For the TDRP and waiver provisions, "disputes" were defined as: (1) "all claims, disputes, or controversies involving the parties to this Agreement and Our employees,

7

servicers and agents, including but not limited to consultants . . .”; (2) “all claims, disputes, or controversies arising from or relating directly or indirectly to . . . this Agreement, the validity and scope of these provisions and any claim or attempt to set aside these provisions”; (3) all federal or state claims arising from or relating to the Loan Agreement; (4) all claims brought by the Borrowers as representatives or members of a class against the lenders “or related third parties”; and (5) “all claims related to setting aside the Waiver of Jury Trial provision or the [TDRP] provision, including claims about such provisions’ validity and scope.” *Id.*

The Borrowers acknowledged in signing the Loan Agreement (1) that it was “subject solely and exclusively to the Tribal law and jurisdiction of the [Tribe]”; and (2) that the TDRP was “the sole and exclusive forum for resolving disputes and/or claims arising from or relating to this Agreement.” *Id.* at 1938. They also acknowledged the waiver provision.

D.

In June 2017, the Borrowers filed a class action complaint against the Entities, Martorello, and other parties not relevant to the current appeal. The Borrowers brought claims for declaratory judgment, violations of federal civil RICO law, violations of Virginia usury law, and unjust enrichment.

The Entities moved to dismiss for lack of subject matter jurisdiction, asserting that they were entitled to tribal sovereign immunity. Following jurisdictional discovery, the district court denied the motion, and the Entities appealed. We reversed the district court’s decision and remanded with instructions to grant the Entities’ motion to dismiss for lack

8

of subject matter jurisdiction. *See Williams*, 929 F.3d at 185. We found no clear error in the district court's factual findings on that record and held that the Entities had met their burden of establishing entitlement to sovereign immunity. *Id.* at 177.

After remand, the district court dismissed the Entities for lack of subject matter jurisdiction.[4] The district court also ordered briefing on the Borrowers' claims that Martorello had misrepresented certain facts in an earlier declaration. After an evidentiary hearing on this issue, the district court issued an opinion (the "Misrepresentation Opinion") in which it found that Martorello made misrepresentations in the declaration. *Williams v. Big Picture Loans, LLC*, No. 3:17cv461, No. 3:18cv406, 2020 WL 6784352, at *4, *6–7, *9–12 (E.D. Va. Nov. 18, 2020). The court held that the misrepresentations related to several material factors relied on in its earlier decision and in this Court's opinion determining that the Entities shared in the Tribe's sovereign immunity. *Id.* at *13–14. The court concluded that the misrepresentations led to "significantly erroneous" findings at the heart of those decisions. *Id.* at *13. And while the court recognized it could not change the immunity issue decided by this Court's prior opinion, it determined that "in analyzing all pending and future motions" in the litigation, it would consider the misrepresentation findings. *Id.* at *14.

---

[4] In the related case of *Galloway v. Williams*, the Borrowers settled with the Entities, and the settlement included the claims against the Entities in this dispute. *See* No. 3:19-cv-470, 2020 WL 7482191, at *1 & n.2 (E.D. Va. Dec. 18, 2020). Based on this settlement and the Entities' dismissal here, the Entities are no longer parties to this dispute surrounding the Tribal lending program and their liability is not at issue.

The district court then issued an opinion concluding that the Borrowers "did not waive their right to participate in a class action against . . . Martorello." *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461, 2021 WL 2930976, at *1 (E.D. Va. July 12, 2021). First, the court found that the class-action waiver did not apply to claims against Martorello because the Loan Agreement covered "disputes" with "related third parties," and "Martorello [wa]s not a 'related third party.'" *Id.* at *3–5. Second, the district court concluded that even if the waiver applied to Martorello, it was unenforceable under the prospective waiver doctrine. *Id.* at *5–7.

The district court also granted the Borrowers' motion for class certification.[5] *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 52 (E.D. Va. 2021). In relevant part, the court determined that common issues predominate because the Borrowers' claims are based on standardized loan contracts and uniform conduct by Martorello. *Id.* at 61–62. Acknowledging that damages for each class member would need to be calculated individually, the district court noted that the damages could likely be calculated from the loan records rather than requiring extensive evidence for each class member. *Id.* at 62.

On the usury and unjust enrichment claims, the district court rejected Martorello's argument that the Borrowers could not show that he received loan payments from all class members because loan payments went first to the lenders and then funds passed to him only based on the lenders' total profitability. *Id.* The court explained that the Borrowers

---

[5] The district court certified the classes and sub-classes described in *Williams*, 339 F.R.D. at 53–54.

planned to look to the contracts between the lenders and Martorello to show that Martorello received most of the lenders' gross revenue, which would show that he received payments on usurious loans and that he was unjustly enriched. *Id.* The district court also disagreed with Martorello's assertion that his role changed over time such that class members would be situated differently as to whether he participated in the debt collection in the same manner in all years at issue. *Id.* at 62–63. The court noted that it already found in the Misrepresentation Opinion that "Martorello was the de facto head of the . . . lending operations at all relevant times." *Id.* at 63.

Martorello petitioned for permission to appeal, which we granted. We have jurisdiction over the grant of class certification pursuant to 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f). We have pendent jurisdiction over the Misrepresentation Opinion because it is "so interconnected" with the class-certification opinion that it "warrant[s] concurrent review." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 364 (4th Cir. 2014) (citation omitted).

## II.

First, Martorello contends that the district court violated this Court's mandate by making new factual findings in the Misrepresentation Opinion that contradict the record from the prior appeal. We review whether a post-mandate decision of the district court violated the mandate rule de novo. *Doe v. Chao*, 511 F.3d 461, 464 (4th Cir. 2007). Under the mandate rule, "a lower court generally is bound to carry the mandate of the upper court into execution and may not consider the questions which the mandate laid at rest." *United*

11

*States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (cleaned up). On remand, a district court cannot reconsider "issues expressly or impliedly decided" on appeal. *Id.* However, if "controlling legal authority has changed dramatically"; "new evidence, not earlier obtainable in the exercise of due diligence, has come to light"; or "a blatant error in the prior decision will, if uncorrected, result in a serious injustice," then the district court may reopen an issue even if the appellate court's mandate did not contemplate relitigating that issue. *Id.* at 67.

We need not decide whether the district court's factual findings in the Misrepresentation Opinion contradicted the facts accepted by this Court in the prior appeal. Even if they did, the new evidence and serious injustice exceptions to the mandate rule apply such that the district court permissibly reconsidered those previous factual findings.

Following this Court's mandate, the district court considered the Borrowers' evidence that Martorello made material misrepresentations to the district court and this Court in the prior proceedings about facts relating to the Entities' sovereign immunity. The district court found that Martorello made misrepresentations in a declaration he filed in support of the Entities' motion to dismiss for lack of subject matter jurisdiction. *Williams*, 2020 WL 6784352, at *4, *6–7, *9–12. When new evidence indicates that a district court previously made erroneous factual findings based on fraud or misrepresentation, the district court may reconsider those findings as needed. *See Bell*, 5 F.3d at 67 (describing the exceptions to the mandate rule); *see also United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (explaining that when a district court proceeding "produc[es] substantially different evidence," an exception to the mandate rule applies). Here, the district court found

12

such fraud or misrepresentations and thus did not violate the mandate rule in reconsidering its prior factual findings.[6]

### III.

Turning to the merits, Martorello first contends that the Borrowers waived their right to bring class-action claims against him. He asserts that the district court erred in concluding that the class-action waiver did not apply to disputes between him and the Borrowers and in finding that the waiver was unenforceable due to the prospective waiver doctrine. Because we agree with the district court that the class-action waiver did not bar the Borrowers from bringing class claims and that the waiver is unenforceable, we reject Martorello's contentions on each of these separate and independent grounds.

### A.

We first address Martorello's argument that the district court erred in determining that the class-action waiver did not apply to claims against him. The district court's interpretation of the Loan Agreement is a matter of contract interpretation that this Court reviews de novo. *Kay Co. v. Equitable Prod. Co.*, 27 F.4th 252, 258 (4th Cir. 2022).[7]

---

[6] Martorello also contends that the district court erred in making certain factual findings in the Misrepresentation Opinion. We will address those arguments as relevant below.

[7] The Loan Agreement states that Tribal law governs it, but the parties have not provided any Tribal law regarding contract interpretation. Therefore, we apply the law of the forum state—Virginia—when interpreting the Loan Agreement. *See Hengle v. Treppa*, 19 F.4th 324, 340 n.5 (4th Cir. 2021).

Under the waiver, the Borrowers forfeit the right to participate in class actions filed against the lender or "related third parties." J.A. 1937. The Loan Agreement defines "related third parties" as "any of Our employees, agents, directors, officers, shareholders, governors, managers, members, parent company or affiliated entities[.]" *Id.* Martorello contends he is an affiliated entity of the lenders and thus falls within this definition of a party immune to class-action proceedings.[8]

"Affiliated entity" is not defined in the Loan Agreement. When a contract does not define a particular term, we look to the "ordinary meaning" of that term. *See Bratton v. Selective Ins. Co. of Am.*, 776 S.E.2d 775, 780 (Va. 2015).

"[A]ffiliated" means "closely associated with another typically in a dependent or subordinate position[.]" *Affiliated*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/affiliated (last visited Jan. 3, 2023) (saved as ECF opinion attachment). And an "entity" is typically defined in this context as "an organization (such as a business or governmental unit) that has an identity separate from those of its members[,]" although it also refers more generally to "something that has separate and

---

[8] Martorello also claims that he is an "agent," "consultant," or "servicer" of Red Rock and Big Picture; however, Martorello's opening brief only briefly mentioned that he should be considered an "agent," with no explanation as to that capacity. He therefore waived this argument. *See Grayson O. Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by . . . failing to develop its argument—even if its [opening] brief takes a passing shot at the issue." (cleaned up)). And the fact that he slightly expanded on the argument in his Reply cannot salvage it. *Yousefi v. INS*, 260 F.3d 318, 326 (4th Cir. 2001) (per curiam) ("The fact that Yousefi pursues this issue in his reply brief does not redeem his failure to do so in the opening brief."). Further, "consultant" and "servicer" are not included in the Loan Agreement's definition of "related third parties," so Martorello's claim that he is a "consultant" and "servicer" is a non-starter.

14

distinct    existence[.]"    *Entity*,    Merriam-Webster.com,    https://www.merriam-webster.com/dictionary/entity (last visited Jan. 3, 2023) (saved as ECF opinion attachment); *see Entity*, Black's Law Dictionary (11th ed. 2019) ("An organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners."). When used together, these words typically refer to related organizations or corporate entities, not to individuals. *See, e.g.*, 53 Pa. Stat. § 895.701-A (defining "affiliated entity" in relevant part as "business entit[ies] owned in whole or in part by a lobbying firm"); *Bd. of Trs. v. Agilent Techs., Inc.*, No. 18-cv-01199-VC, 2019 WL 4729602, at *1 (N.D. Cal. Aug. 13, 2019) ("If one company owns another, those companies are affiliated entities in the ordinary sense of the term."); *Aquino v. Ceva Logistics U.S., Inc.*, No. EDCV 14-01795-VAP, 2015 WL 13919076, at *3 (C.D. Cal. Mar. 24, 2015) (explaining that "[e]very dictionary consulted by the Court ascribes a distinct corporate nexus to ['affiliated or related entities']"). This is especially true where "affiliated entities" immediately follows "parent corporation," suggesting that "affiliated entities" refers to business units such as subsidiaries or sister companies. *See BP Prods. N. Am., Inc. v. Stanley*, 669 F.3d 184, 190 (4th Cir. 2012) ("Under Virginia law, terms in a contract will be interpreted in light of the context in which they appear.").

Although certain sources define "affiliated entities" to include individuals, *see, e.g.*, 40 C.F.R. § 66.3 ("Affiliated entity means a person who . . . is controlled by, or is under common control with the owner or operator of a source."), if that term is construed to include all individuals affiliated with the Entities, then the "related third parties" definition would be superfluous because it specifically includes "employees, agents, directors,

15

officers, shareholders, governors, managers, [and] members" within its scope, J.A. 1937; *see Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 254 n.32 (Va. 2016) ("In interpreting contracts, effect should be given to every part of the instrument, if possible, and no part thereof should be discarded as superfluous or meaningless." (cleaned up)).

Therefore, we conclude that the term "affiliated entities" in the Loan Agreement does not refer to individuals. Because Martorello is an individual, he is not a party exempted from class-action claims and liability.

Martorello argues, however, that the Borrowers are estopped from disclaiming the class waiver. In support of this argument, he relies on *American Bankers Insurance Group v. Long*, 453 F.3d 623 (4th Cir. 2006), and related case law. In *American Bankers*, a non-signatory to a contract sought to compel arbitration with the plaintiff-signatories based on an arbitration clause in the contract "providing 'that any dispute, controversy or claim arising out of or in connection with, or relating to, any subscription of the Note, or any breach or alleged breach hereof, . . .' shall be subject to arbitration." *Id.* at 625. The non-signatory argued that the plaintiffs should be estopped from asserting that it was not a signatory to the arbitration clause because the plaintiffs' claims against the non-signatory relied on the contract. *Id.* at 626. The non-signatory therefore asserted that the plaintiffs should not be allowed to enforce the duties created by the contract but avoid the contract's arbitration provision. *Id.* at 628. This Court agreed, concluding that because the plaintiffs' claims relied on the contract's terms, "it would be inequitable to allow [the plaintiffs] to seek recovery on their individual claims [but] at the same time deny that [the non-signatory] was a party to the [contract's] arbitration clause." *Id.* at 630.

16

*American Bankers* is distinguishable and inapposite. This is so because Martorello attempts to refute an argument the Borrowers do not make. The Borrowers are not contending that the class-action waiver does not apply because Martorello is not a signatory to the Loan Agreement. Instead, the Borrowers posit that the class-action waiver does not apply to Martorello because it only applies to litigation against the lenders and related third parties, and he is neither of those. Estoppel does not prevent the Borrowers from making this "quite different argument that [their] claims do not fall within the scope of the [waiver] clause." *Id.*[9]

In conclusion, we agree with the district court that the class-action waiver does not apply to disputes with Martorello. Therefore, the Borrowers are not barred from bringing the class claims at issue.

B.

Next, we address Martorello's contention that the district court improperly concluded that the prospective waiver doctrine applied and rendered the class-action waiver unenforceable.

The prospective waiver doctrine invalidates agreements that prospectively waive a party's right to pursue statutory remedies in certain circumstances. *See Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 235 (2013); *Hengle*, 19 F.4th at 335 ("But where

---

[9] To the extent the district court concluded that Martorello cannot enforce the class-action waiver because he is not a party to the Loan Agreement, we need not address this finding because even if it is correct, the claims against Martorello do not fall within the scope of the waiver.

17

an arbitration agreement prevents a litigant from vindicating federal substantive statutory rights, courts will not enforce the agreement."). Such a waiver renders an agreement unenforceable because it violates public policy. *Gibbs v. Sequoia Capital Ops., LLC*, 966 F.3d 286, 292 (4th Cir. 2020). This Court has applied the prospective waiver doctrine to "arbitration agreements that limit a party's substantive claims to those under tribal law." *Hengle*, 19 F.4th at 335 (citation omitted) (listing cases). Because the application of the prospective waiver doctrine is a matter of contract interpretation, we review the district court's application of it de novo. *C.f. Kay Co.*, 27 F.4th at 258.

1.

Preliminarily, Martorello asserts that the prospective waiver doctrine only applies to arbitration agreements and cannot be extended to any other agreement so as to apply to the TDRP. Martorello is correct that we have previously only applied this doctrine in the arbitration context. *See Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334–36 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673–76 (4th Cir. 2016); *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 371–73 (4th Cir. 2012); *Sequoia Capital*, 966 F.3d at 292–94; *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 339–45 (4th Cir. 2020); *Hengle*, 19 F.4th at 334, 342. But in discussing this doctrine, we have linked its application to the Supreme Court's broader recognition that "courts will invalidate *any contract—arbitration or otherwise*—that attempts to foreclose 'the assertion of certain statutory rights' because such a contract would jeopardize a party's 'right to pursue statutory remedies[.]'" *Haynes*, 967 F.3d at 340 (citing and quoting *Am. Express*, 570 U.S. at 236) (emphasis added); *see*

18

*also Hengle*, 19 F.4th at 334 (explaining that the prospective waiver doctrine is a "*generally applicable* [contract] defense" (emphasis added)).

The rationale underlying the prospective waiver doctrine supports its application to non-arbitration contracts: a prospective waiver of federal statutory rights is unenforceable because it violates public policy. *Sequoia Capital*, 966 F.3d at 292; *Hengle*, 19 F.4th at 334. The violation of public policy is a contract-enforcement defense applicable to various contractual arrangements, not just arbitration agreements. *See BP Prods.*, 669 F.3d at 189 (explaining that under Virginia law, noncompete covenants in employment contracts are enforceable if, *inter alia*, they do not violate public policy); *Elderberry of Weber City, LLC v. Living Ctrs.-Se., Inc.*, 794 F.3d 406, 412 (4th Cir. 2015) (providing, in the context of a lease, "the prevailing rule is that parties to a contract may provide the remedy that will be available to them in case a breach occurs so long as the remedy provided is not contrary to the law or against public policy" (cleaned up)).

Martorello claims that there is a "critical distinction between arbitration and a tribal forum—the Borrowers may sue in federal court after exhausting the administrative remedies available to them in Tribal Court[.]" Opening Br. 36. He asserts that because the Borrowers could later sue in federal court, the prospective waiver doctrine does not apply. We disagree with Martorello's contentions.

First, parties to an arbitration agreement may sue in federal court following an arbitration award, under the procedures in the Federal Arbitration Act. *See* 9 U.S.C. §§ 9–11; *Warfield v. ICON Advisers, Inc.*, 26 F.4th 666, 669 (4th Cir. 2022) (describing post-arbitration-award lawsuit in which the Court considered whether to enforce or vacate

award). Therefore, the ability to sue in federal court on an arbitration award alone is not sufficient to circumvent the prospective waiver doctrine.

Second, the tribal exhaustion doctrine that Martorello cites to assert that the Borrowers may later sue in federal court is not applicable here. When the existence and extent of a tribal court's jurisdiction is at issue, the tribal court is first allowed to examine the jurisdictional challenge: that is the tribal exhaustion doctrine. *See Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 855–56 (1985). This doctrine does not provide a right to sue in federal court except in cases involving challenges to the tribal court's jurisdiction. *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 19 (1987) ("Unless a federal court determines that the Tribal Court lacked jurisdiction, however, proper deference to the tribal court system precludes relitigation of issues raised by the [underlying plaintiffs'] bad-faith claim and resolved in the Tribal Courts."). That jurisdiction is not at issue here, so the tribal exhaustion doctrine has no application.

Third, while Martorello asserts that the Borrowers will have an absolute right to sue in federal court upon the conclusion of Tribal Court proceedings, the Loan Agreement expressly contradicts that claim. *See* J.A. 1937 ("Your right to file suit against Us for any claim or dispute arising from or relating to this Agreement is limited by the WAIVER OF JURY TRIAL AND THE TRIBAL DISPUTE RESOLUTION PROCEDURE provisions." (capitalization in original)); *id.* (providing, as the final step of the TDRP, that "[a] consumer may appeal an Authority decision and order by filing a written petition for review with the Tribal Court"); *id.* at 3098 ("The Tribal Court's opinion and order may not be appealed.").

20

Therefore, Martorello's claim that the prospective waiver doctrine is limited to arbitration agreements fails.

2.

Turning to the application of the prospective waiver doctrine on the merits, we conclude that the doctrine renders the class-action waiver unenforceable because the waiver itself, the Loan Agreement, and the Code provisions incorporated into the Loan Agreement make clear that the waiver does not permit the Borrowers to effectively vindicate their federal rights.[10]

a.

Our prior application of the prospective waiver doctrine to similar agreements involving tribal law offers informative context as to how this doctrine applies to the current dispute.

First, in 2016, this Court decided *Hayes v. Delbert Services Corp.* in which the plaintiff—a payday-loan borrower—filed a putative class action against the loan's servicer for allegedly using debt collection practices that violated federal law. 811 F.3d at 668. The servicer moved to compel arbitration, and this Court held that the arbitration agreement was unenforceable because "[t]he agreement purportedly fashion[ed] a system of alternative dispute resolution while simultaneously rendering that system all but impotent through a categorical rejection of the requirements of state and federal law." *Id.*; *see also*

---

[10] In this section, "class-action waiver" refers to the entire provision beginning with "Waiver of Jury Trial." J.A. 1937.

*id.* at 673 ("Th[e] arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims."). In reaching this conclusion, the Court relied on two sets of provisions in the agreement. First, various clauses stated that the arbitration agreement was governed solely by the law of the tribe. *Id.* at 675. Second, the underlying loan agreement expressly disavowed the application of federal and state law. *Id.* at 669–70, 676.

The next year, the Court decided *Dillon v. BMO Harris Bank, N.A.*, where we again found an arbitration provision in a payday-loan agreement to be unenforceable. 856 F.3d at 332. The arbitration agreement in *Dillon* required the application of tribal law, and the underlying loan agreement explicitly disclaimed the application of state and federal law. *Id.* at 331–32, 335–36.

In 2020, the Court decided *Gibbs v. Haynes Investments, LLC*, and *Gibbs v. Sequoia Capital Operations, LLC*. In *Haynes*, the Court analyzed agreements that differed from the agreements in *Hayes* and *Dillon* in that they did not expressly disclaim the application of federal law. 967 F.3d at 341–42. Nonetheless, because the agreements provided that they were governed by tribal law and limited the arbitrator to applying tribal law and deciding the dispute in a way consistent with tribal law, the Court saw "no material distinction" between them, *id.* at 341, reasoning that "the practical effect is the same [as in *Hayes* and *Dillon*] because they *do* provide that tribal law preempts the application of any contrary law—including contrary federal law," *id.* at 342. This conclusion was reinforced by the agreements' provisions that permitted appeals only through tribal courts and to review whether the conclusions of law were erroneous solely under tribal law. *Id.* at 343.

Moreover, while the *Haynes* defendants claimed the borrowers could vindicate their federal statutory rights through tribal law because tribal law incorporated or required compliance with federal law, the Court disagreed, explaining that the borrowers could not "effectively vindicate the federal protections and remedies they s[ought]" through tribal law for three reasons. *Id.* First, although the tribal code required lenders to comply with "federal laws as applicable" and listed applicable federal consumer protection statutes, that list did not mention the federal law governing the claims at issue—RICO. *Id.* Further, even for the laws included in the list, the tribal code "ma[de] clear that a lender's compliance d[id] not constitute consent related to the applicability of federal laws or a waiver of the lender's sovereign immunity." *Id.* (cleaned up). Second, while the tribal code required "licensed lenders" to comply with federal law, it did not say the same about "non-tribal entities or individuals associated with the lenders who may have violated RICO." *Id.* Third, even if the borrowers could bring RICO claims against the defendants under tribal law, the tribal code did not indicate *how* consumers could go about doing so. *Id.* at 344. For example, although the tribal code created a consumer-complaint procedure, it did not create a private right of action for violations of its provisions or federal law. Moreover, the tribal commission overseeing any such claim could grant or deny relief as it deemed appropriate in its discretion, such that the relief the borrowers sought would not be available.[11] *Id.* The

---

[11] The Court also explained that other general federal-law references in the agreements supported applying the prospective waiver doctrine because the references "either disclaim[ed] the applicability of federal law or simultaneously provide[d] that tribal law w[ould] be controlling." *Haynes*, 967 F.3d at 344 n.9.

23

Court therefore found that the effect of the provisions was to "make unavailable to the borrowers the effective vindication of federal statutory protections and remedies," meaning that the arbitration agreements amounted to a prospective waiver and were unenforceable. *Id.*

Similarly, in *Sequoia Capital*, an arbitration agreement provided for the application of tribal law, limited remedies to those available under tribal law, and limited appeals to an arbitration award's conformity with tribal law. 966 F.3d at 293. We concluded that those provisions "prevent[ed] claimants from vindicating a RICO claim for treble damages" by "mandat[ing] the primacy and effective control of tribal law in resolving any disputes" even though the agreement did not explicitly disclaim the application of federal law. *Id.* The defendants argued that because the agreements indicated that federal claims would be resolved by arbitration, the borrowers could pursue them. *Id.* But the Court reasoned that the language did not "counteract the effect" of the above-described provisions providing for the application of tribal law. *Id.* The Court thus held the arbitration agreement to be unenforceable. *Id.* at 294.

Finally, in 2021, the Court decided *Hengle v. Treppa*, in which we concluded that an arbitration agreement and its delegation clause were unenforceable. 19 F.4th at 342. The Court reasoned that the agreement's provisions providing for the exclusive application of tribal law operated as prospective waivers, even though they did not "explicitly disclaim the application of federal law," because the effect of the provisions "demand[ed] exclusive application of tribal law, thereby preempting application of other authority." *Id.* at 338–39 (quoting *Haynes*, 967 F.3d at 342); *see id.* at 342.

24

In *Hengle*, the arbitration agreement's references to the Federal Arbitration Act (the "FAA") and other federal law did not save it given other provisions requiring the application of tribal law. *Id.* at 340. The Court rejected the defendants' attempt to take the FAA reference "out of its context and construe it as a portal through which all federal and state law defenses to arbitrability are imported into the agreement and made available for application," thereby "creat[ing] conflict with the other terms of the arbitration provision, which require that the arbitration be governed by the laws of the Tribe and forbid the arbitrator to apply any other law other than the laws of the Tribe." *Id.* at 341 (cleaned up). Additionally, while the arbitration agreement referenced other federal laws, the Court rejected the defendants' argument that all federal-law claims were covered by the agreement. *Id.* at 343. The Court reasoned that the references to federal law "highlight[] the arbitration provision's impermissible tactic of compelling arbitration of federal claims only to then nullify those claims by precluding application of federal law." *Id.*

Relatedly, the defendants in *Hengle* asserted that the tribal code there incorporated federal law such that the agreement's invocation of tribal law did not displace federal law. *Id.* But the Court rejected this argument because, as in *Haynes*, RICO was absent from the tribal code's list of federal statutes with which lenders had to comply. *Id.* Moreover, the tribal code did not include a private right of action for violations of federal law. *Id.* Finally, the tribal code's consumer-complaint procedure permitted the tribal commission reviewing complaints to "grant or deny any relief as the Commission determine[d] appropriate" and limited the amount of any award. *Id.* at 343–44. Therefore, the Court concluded that the arbitration agreement was unenforceable. *Id.* at 344.

25

b.

Following our precedent, we conclude that the prospective waiver doctrine renders the class-action waiver here unenforceable because it is governed solely by Tribal law. References to federal law in the Loan Agreement and Code do not make the waiver enforceable.

First, the waiver provision and the Loan Agreement in general provide that they are governed exclusively by Tribal law. *See* J.A. 1934 ("This Loan Agreement . . . is governed by the laws of the [Tribe]."); *id.* at 1937 ("All disputes . . . shall be resolved by the [TDRP] only on an individual basis with You as provided for pursuant to Tribal law."); *id.* at 1938 ("You acknowledge and agree that this Agreement is subject solely and exclusively to the Tribal law[.]"). As in *Sequoia Capital*, these provisions "mandate the primacy and effective control of tribal law in resolving any disputes arising out of these agreements" and constitute a prospective waiver. 966 F.3d at 293; *see also Haynes*, 967 F.3d at 342 ("Although these provisions do not explicitly disclaim the application of federal law, the practical effect is the same because they *do* provide that tribal law preempts the application of any contrary law[.]"); *Hengle*, 19 F.4th at 338 (explaining that the agreements mandate the exclusive application of tribal law).

Moreover, although Martorello argues that the Governing Law provision incorporates federal law into the definition of "Tribal law," that reference is not determinative—such a provision must be viewed in context to determine its actual meaning. *See Hengle*, 19 F.4th at 341.

26

The Code provisions about the TDRP do mention federal law. *See* J.A. 3090 ("Licensees[12] shall at all times comply with . . . all other applicable Tribal, and federal laws as applicable."); *id.* ("A Licensee shall conduct business in a manner consistent with principles of federal consumer protection law, including, without limitation, the following [list of federal consumer protection laws]."). But the Code also provides that the Authority that would hear the Borrowers' complaints "has in no way waived any defenses or position related to the applicability of the above [federal consumer protection] laws to the Tribe or any Financial Services Licensee." *Id.* Therefore, as this Court found when faced with similar language in *Haynes*, these Code provisions cannot be read as making federal law applicable to claims brought via the TDRP. 967 F.3d at 343 & 344 n.9 (reviewing similar language and concluding it "evince[d] an attempt to disclaim the applicability of federal law").

In addition, while providing that Licensees must comply with federal law, the Code does not clearly provide for a private right of action such that consumers can seek redress for violations of the Code that injure them. *See id.* at 344 ("Although the Ordinance contains a consumer complaint procedure, it does not provide for or establish any private right of action for violations of any provisions, let alone any federal laws."); *Hengle*, 19 F.4th at 343. And even assuming the Code did provide for such a private right of action,

---

[12] The parties dispute whether Martorello is a "Licensee" such that the TDRP can be used to bring claims against him. We need not reach this issue because, even assuming Martorello is a Licensee, the Borrowers would not be able to effectively vindicate their federal statutory rights through the TDRP.

the Authority overseeing consumers' claims is not bound to provide appropriate federal relief, because "[t]he Authority may grant or deny any relief as the Authority determines appropriate." *Compare* J.A. 3097, *with Hengle*, 19 F.4th at 343 (explaining that the tribal ordinance at issue would not permit the plaintiffs to assert their RICO claims for treble damages because "the tribal commission tasked with reviewing a lender's handling of a complaint may grant or deny any relief as the Commission determines appropriate" (internal quotation marks omitted)); *Haynes*, 967 F.3d at 344 (same). Relatedly, the Tribal Court to which the consumer may appeal can only reverse the Authority's decision if it concludes that it "conflict[s] with Tribal law[13] or the Tribal Constitution." J.A. 3098; *Haynes*, 967 F.3d at 343–45 (invalidating an arbitration agreement containing similar language). Therefore, the Code provisions referenced by the Loan Agreement would not permit the Borrowers to effectively vindicate their federal statutory rights.

Martorello counters that the TDRP expressly allows claims to be brought under federal law based on its definition of "disputes," which includes "all Tribal and U.S. federal or state law claims" and "all claims based upon a violation of any Tribal, state or federal constitution, statute, regulation or ordinance[.]" J.A. 1937. But this Court rejected a similar argument in *Sequoia Capital*, 966 F.3d at 293. As explained above, if the Borrowers attempted to bring claims under such language, the Code and TDRP would prevent vindication of them. *See id.*; *see also Hayes*, 811 F.3d at 673–74 ("With one hand, the

---

[13] While Martorello argues that the definition of "Tribal law" in the Loan Agreement encompasses federal law, he does not make a similar argument about references to "Tribal law" in the Code.

28

arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away."); *Hengle*, 19 F.4th at 343 ("If anything, such language highlights the arbitration provision's impermissible tactic of compelling arbitration of federal claims only to then nullify those claims by precluding application of federal law.").

For all these reasons, this case is analogous to our recited precedent in which we found the prospective waiver doctrine applies. Although Martorello asserts that there is uncertainty over whether the Authority would apply federal statutory remedies such that the Authority should first be allowed to determine whether the waiver deprives the Borrowers of such remedies, we find no such uncertainty. *See Sequoia Capital*, 966 F.3d at 294 (declining to find uncertainty). We therefore agree with the district court's application of the prospective waiver doctrine and hold the class-action waiver unenforceable.

IV.

Martorello concludes his appeal by arguing that even if the Borrowers did not waive their right to pursue their claims as a class action, the district court nevertheless abused its discretion in granting certification. He contends that individual, not common, questions of fact predominate and thus bar class certification. We disagree.

This Court's "review of class certification issues is deferential, cognizant of both the considerable advantages that our district court colleagues possess in managing complex litigation and the need to afford them some latitude in bringing that expertise to bear."

29

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019). As such, we review a district court's decision to certify a class for abuse of discretion, which occurs when the district court "materially misapplies the requirements of Rule 23," *EQT Prod.*, 764 F.3d at 357, or "clearly errs in its factual findings," *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* (citation omitted).

Martorello does not dispute that the requirements of Federal Rule of Civil Procedure 23 are met except as to Rule 23(b)(3). In that regard, Martorello posits that the Borrowers have not met their burden under that provision, which requires the court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3). In analyzing this claim, we are mindful that "[e]ven a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation." *EQT Prod.*, 764 F.3d at 366. Therefore, the court must "give careful scrutiny to the relation between common and individual questions in the case." *Krakauer*, 925 F.3d at 658 (citation omitted).

30

Martorello raises two primary arguments to support his contention that individual questions predominate. First, he posits that his role in the lending operations changed over the class period. Therefore, the Borrowers will require individualized proof of his role in the lending operations during their respective loan-repayment periods to show that he "participated in the direction of the affairs of the alleged enterprise" to establish his RICO liability. *See* Reply Br. 25. Second, he argues that individualized tracing will be necessary to establish that he received some portion of the interest payments of each Borrower, such that Borrowers will need to rely on individual proof to establish his liability to each of them for usury and unjust enrichment.[14] We address each argument in turn.

## A.

Martorello first asserts that to establish that he violated RICO, the Borrowers must prove that he "participated in the direction of the affairs of the alleged enterprise" and that he proximately caused their harm.[15] Reply Br. 25. But because his participation in the

---

[14] In his Reply Brief, Martorello argues for the first time that "the existence of a form agreement to which Martorello was not a party in no way supports [the Borrowers'] position [on predominance]." Reply Br. 19. But he fails to explain why the fact that he was not a party to the Loan Agreement is relevant to the predominance analysis, particularly when (1) he does not dispute the form nature of the Loan Agreement, and (2) he elsewhere relies on the standard provisions of the Loan Agreement to support his contention that all class members waived their right to participate in a class action. Further, his attempt to distinguish the cases regarding form agreements on which the Borrowers rely fails. None of those cases indicate that whether the defendant was a party to the form agreement was determinative—or even relevant—to the predominance analysis, and Martorello has pointed to no cases making that point.

[15] The Borrowers respond that to establish Martorello's RICO liability, they only need to show Martorello's "operation or management" of the lending enterprise, not that he was involved "in its day-to-day operations." Response Br. 41. They assert that "[a]ny

31

lending operations allegedly decreased over time, Martorello argues that the Borrowers will not be able to meet their burden of proof on a class-wide basis—instead, they will need to rely on individual proof of his role at the time they repaid their loans to show that he "participated in the direction of the affairs of the alleged enterprise" then. *Id.*

As evidence of his diminishing role in the lending business over the class period, Martorello argues that certain facts found by the district court in the class certification opinion—which built on its findings in the Misrepresentation Opinion—were erroneous. He contends the district court improperly made the following factual findings related to his continuing role: (1) "Martorello was the de facto head of the [Tribe's] lending operations at all relevant times"; (2) "Martorello was functionally in charge of the lending business and the Tribal 'managers' were 'rather meaningless'"; and (3) "even after the [Tribe] restructured the lending operations to avoid regulatory scrutiny, the evidence strongly shows that Martorello was still running the show" and that "[e]xcept for a few cosmetic changes . . . , the [Tribe's] lending operation by way of Big Picture continued as it had under the Red Rock structure." Opening Br. 50 (quoting *Williams*, 339 F.R.D. at 54, 63). He asserts that as Red Rock took over tasks previously handled by SourcePoint, his role correspondingly decreased until it ended after the sale of Bellicose to the Tribe in 2016. As a result, Martorello contends the Borrowers will not be able to prove that he "participated

---

purportedly different role would thus create no individualized issues because Martorello's liability turns on his high-level involvement as the owner and manager of Bellicose." *Id.* at 42.

in the direction of the" lending operation for the entire class period with class-wide proof. Reply Br. 25.[16]

Having reviewed the record, we conclude the district court's findings were not clearly erroneous. Put another way, we are not "left with the definite and firm conviction that a mistake has been committed." *Hall*, 664 F.3d at 462 (quoting *U.S. Gypsum Co.*, 333 U.S. at 395).

As to the district court's conclusion that Martorello operated as the "de facto head" of the Tribe's lending operations during the class period, he argues that the court erroneously discredited his prior statement that Red Rock's co-managers were ultimately responsible for decisions about Red Rock's operations. The record, however, supports the district court's conclusion. For example, a 2011 email from Flint Richardson[17] to Martorello stated that the Tribal co-managers were not going to be involved in Red Rock's lending business because Bellicose would completely operate it. *See* J.A. 2489–90 ("THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT [*sic*] INVOLVED IN THE BUSINESS. . . . THE SERVICER,

---

[16] Preliminarily, Martorello points to the prior case findings about the Entities' sovereign immunity. He asserts that certain of the district court's factual findings contradict our prior conclusion that the Tribe controlled the lending business. However, we have already determined that the district court did not violate the mandate rule by making new factual findings in the Misrepresentation Opinion based on misrepresentation and fraud. Therefore, we reject this argument.

[17] Richardson was a business associate of Rob Rosette, an attorney active in tribal lending. Rosette's involvement in Martorello's relationship with the Tribe is somewhat disputed, but it is undisputed that Rosette founded Rosette, LLP, a law firm that represented the Tribe.

BELLCIOSE [*sic*] OPERATES THE BUSINESS COMPLETELTY [*sic*]." (capitalization in original)). Former Tribal Council member Joette Pete confirmed that once Red Rock began lending, the Tribe "had no substantive involvement" in the ongoing operations. *Id.* at 1995.[18] Moreover, former co-manager Craig Mansfield testified that "[a]s far as being a co-manager, I wasn't really heavily involved in the day-to-day operations." *Id.* at 3583. Further, Martorello sent an email in 2016 to Karrie Wichtman of the Rosette law firm and others stating that "the Manager's [*sic*] don't really do anything." *Id.* at 2099. In light of this evidence and other support in the record, we do not find clear error in the district court's conclusion that Martorello operated as the "de facto head" of the Tribe's lending operations during the class period. *See Anderson*, 470 U.S. at 573–74 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals

---

[18] Martorello asserts that the district court should not have relied in the Misrepresentation Opinion on the declaration of Joette Pete, "a disgruntled former member of the Tribal Council" who "was involuntarily removed on August 12, 2016[,] as a result of tribal judicial proceedings brought against her." Opening Br. 58. He claims that Pete's declaration "was not based on her personal knowledge and had been written by the Borrowers' counsel." *Id.* Further, he argues that Pete never worked or performed any services for Red Rock or Big Picture, never visited their offices, and never played a role in their operations, and that therefore her declaration was "unreliable." *Id.* at 60. But the district court did not rely solely on Pete's declaration for its findings; it relied on other record evidence as well. *See, e.g.*, *Williams*, 2020 WL 6784352, at *4 (relying on Pete's declaration where the information it contained was affirmed by another witness' testimony); *id.* at *6–7 (citing Pete's declaration, which was supported by language in an email from Martorello). In addition, the district court observed Pete's videotaped deposition, thereby giving it the chance to evaluate her credibility. We will not disturb the district court's conclusion that Pete was credible, particularly where her statements were supported by other evidence. *See United States v. Shea*, 989 F.3d 271, 278 (4th Cir. 2021) ("[W]hen a factual finding is based on witness credibility, the appellate court gives even greater deference."). Therefore, Martorello's attempt to attack Pete cannot establish clear error "in light of the record viewed in its entirety." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

34

may not reverse it[.]"). And the fact that Martorello served as the "de facto head" of the lending operations for the entire class period supports the district court's determination that the Borrowers will be able to use common proof to show that Martorello "participated in the direction of the" lending operations such that common questions predominate over individual questions for Rule 23(b)(3) purposes. Reply Br. 25.

Martorello next asserts that the district court erred by concluding that he demanded, took, or received consumer payments on loans originated by Red Rock. He argues that because he and his companies "never took or received any payments from consumers as part of the Tribe's lending business," that is evidence of his limited involvement in Red Rock's lending business. Opening Br. 57. To establish RICO liability, he suggests, the Borrowers would need to individually prove that during each Borrower's repayment of his or her loans, Martorello was directing the lending operations—a crucial part of which was receiving loan payments from consumers.

In rejecting this argument, the district court reasoned that because "[c]ollection of the consumer loans was a key component of the lending operation," *Williams*, 2020 WL 6784352, at *6, and because the record indicated that Bellicose—a Martorello-owned and controlled entity—received loan payments from consumers, *id.*, "Martorello had de facto control of Red Rock['s] . . . lending operations," *Williams*, 339 F.R.D. at 54. The district court explained that "money paid by consumers went into the Bellicose bank account over

35

which only Martorello and his employees had control and access." *Williams*, 2020 WL 6784352, at *6.[19]

The district court concluded that Martorello received payments on the consumer loans based, in part, on his own testimony, which the court found not credible: "Martorello's demeanor and conduct when answering questions on this topic of the evidentiary hearing compels the conclusion that Martorello was not telling the truth and that, in fact, contrary to the affidavit, Bellicose collected the consumer loans originated by Red Rock." *Williams*, 2020 WL 6784352, at *6. The district court's determination regarding Martorello's credibility deserves "the highest degree of appellate deference." *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 824 (4th Cir. 1992); *see United States v. Shea*, 989 F.3d 271, 278 (4th Cir. 2021) ("[W]hen a factual finding is based on witness credibility, the appellate court gives 'even greater deference.'" (quoting *Anderson*, 470 U.S. at 573)). As this Court has explained:

> The trial court is uniquely qualified to determine which witnesses are most credible and to resolve conflicts among witnesses' testimony, for the simple reason that it has the benefit of observing the witnesses, and is thereby "aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."

*U.S. Fire Ins.*, 966 F.2d at 824 (quoting *Anderson*, 470 U.S. at 575).

---

[19] Further, the Borrowers claim that based on Martorello's contracts with the tribal entities, he "received 98% of Red Rock's and 95% of Big Picture's revenue from loans across the entire class period" such that "he cannot deny that he personally pocketed tens of millions of dollars from those payments." Response Br. 38. Of course, the Borrowers must prove this statement at trial.

The record *supports* the district court's conclusion that Martorello lied when he said he was never involved in receiving or demanding payments on Red Rock loans. *Compare* J.A. 1878 (Martorello's declaration that he "never [took] any action to collect, in whole or in part, any consumer loan originated by Red Rock."); *with, e.g., id.* at 2519 (servicing agreement between Red Rock and Bellicose stating that Bellicose would "collect all gross revenues" from the lending operations); *id.* at 2359 (indicating that one Bellicose employee "manage[d] payment processing for Tribal client portfolios"); *id.* at 2364 (stating that SourcePoint's responsibilities included various tasks related to "[p]ayment [p]rocessing" such as "[c]reat[ing]/maintain[ing] procedures on the daily payment processing" and "manag[ing] the ACH, RCC and Debit Card file upload process"). Accordingly, the district court's credibility determination and the substantive findings that flow from it—namely, that Martorello received consumer payments on Red Rock loans such that he was functionally in charge of Red Rock's lending operations—are supported by the record.

In sum, we conclude that the district court did not clearly err in refusing to credit certain portions of Martorello's testimony. Nor did it clearly err in determining that Martorello ultimately received consumer loan payments and in finding that this fact supported its conclusion that Martorello was essentially in charge of Red Rock's lending operations through the projected class periods. And neither did the court err in reasoning that Martorello's substantial involvement in Red Rock's lending operations supported the conclusion that common questions predominate because the Borrowers can rely on common proof to show that Martorello participated in and controlled the direction of the lending operations to establish RICO liability.

37

Turning next to the district court's findings that Martorello was still largely in charge of the lending operations after the restructuring and that Big Picture operated as Red Rock had, Martorello's only contention is that the district court improperly relied on the declaration of Joette Pete. As explained above, *supra* n.18, we reject this argument in view of the additional record evidence supporting the district court's conclusions. For example, the record shows that Martorello planned to continue running the lending operations after the Tribe restructured. *See, e.g.*, J.A. 2225 (2014 email from Martorello describing his plan to sell Bellicose "'as is', with existing Management in place and the company remaining substantially the same" and stating that "[i]t also needs to be run in the same format it is today. This is a vital component to the cultural side, as any shifting of jobs/departments, relocation, firing/hiring, or change in leadership/direct reports, etc[.,] will trigger a signal to people . . . . We can't risk a mass exodus, concerns, fear, etc. associated with the deal."); *id.* at 2346 (2014 email from Martorello stating that "the seller will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid. . . . No need to reinvent the wheel or shake things up[.]"); *id.* at 2242 (2015 email from Martorello stating that "if the Borrower was to cut SPVI [SourcePoint] out of the picture, then you simply cannot perform as a business. . . . This lender very explicitly will not lend to RRTL [Red Rock] unless SPVI always remains servicer."). And once the business was restructured such that the Tribe had purchased Bellicose and Red Rock became Big Picture, the record supports the conclusion that Martorello retained control of the business. *See id.* at 2223 (text message from Martorello stating that Ascension President Brian McFadden was "getting too big for [his] britches"

38

and explaining that "[h]e may have to be disappointed somewhere down the near term road, he's not the founder and $1mm a year buys a lot of very capable replacements."). The district court did not clearly err in its factual findings that Martorello was still largely in charge of the lending operations after the restructuring and that he effectively controlled the tribal lending entities.

In sum, the district court did not err in finding that Martorello was the controlling head of the lending operations throughout the class period. Accordingly, the Borrowers can use class-wide proof of Martorello's significant and relatively unchanging role in their effort at trial to establish that he "participated in directing the alleged enterprise's affairs" and that he proximately caused the Borrowers' harm under RICO. Reply Br. 25. We thus conclude that the district court did not misapply Rule 23(b)(3) when rejecting Martorello's first argument against a finding of predominance.

## B.

Next, we address Martorello's argument that the Borrowers' usury and unjust enrichment claims cannot be established with class-wide proof because individualized tracing would be required to establish Martorello's liability to each individual Borrower.

Both theories of liability require the Borrowers to establish that Martorello received some portion of the loan proceeds. Specifically, under Virginia usury laws, "[i]f interest in excess of that permitted by an applicable statute is paid upon any loan, the person paying may bring an action . . . to *recover from the person taking or receiving such payments*." Va. Code Ann. § 6.2-305(A) (emphasis added). Relatedly, to establish a claim for unjust

39

enrichment, the Borrowers must establish that they conferred a benefit on Martorello. *See Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008).

Martorello argues that to establish his liability under either usury laws or for unjust enrichment, each individual Borrower would need to show that he received some portion of their interest payments. Continuing, Martorello posits that because neither he nor the entities he owned directly took or received consumer-loan payments and because they did not receive contractual payments related to the lending operations in some months, the Borrowers would need to individually trace their interest payments through Big Picture or Red Rock to a Martorello-owned entity. In response, the Borrowers assert that the question of Martorello's receipt of interest payments is a common question that they can answer through common proof—namely, proof of Martorello's receipt of consumer-loan payments through the Bellicose bank account and/or proof of the contracts between the tribal entities and Martorello-owned entities that show that Martorello-owned entities received a percentage of the loan revenue for the class period.

At this stage, we need not decide whether the Borrowers will establish that Martorello in fact received usurious payments or an unjust benefit conferred by the Borrowers through their proffered common evidence. This is because at the class certification stage, courts may not "engage in free-ranging merits inquiries." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Instead, courts may consider merits questions "only to the extent necessary to verify that Rule 23 has been satisfied." *Brown v. Nucor Corp.*, 785 F.3d 895, 903 (4th Cir. 2015).

Therefore, it is unnecessary at this stage of the common-question analysis to

40

determine whether the Borrowers will ultimately prove Martorello's liability. This is because either way, this issue—whether Martorello is liable for usury or unjust enrichment based on his receipt of usurious payments or an unjust benefit—is capable of resolution on a class-wide basis. *See Amgen*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666–67 (9th Cir. 2022) (en banc) ("[A] district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial.").

On the merits, the Borrowers may present their common evidence as part of their burden to prove that Martorello received usurious payments or that he received a benefit from the loan payments such that he was unjustly enriched. If the district court finds that the evidence is sufficient, the Borrowers will defeat a summary-judgment motion, for example, as to the entire class. Similarly, if the court determines that proof of the payment arrangements between Big Picture or Red Rock and Martorello is insufficient, then the usury and unjust enrichment claims would fail as to the entire class. Therefore, the Borrowers' "inability to prove" Martorello's liability with their evidence "would not result in individual questions predominating," but would rather "end the case," causing the class's liability on the usury and unjust enrichment claims to "prevail or fall in unison." *Amgen*, 568 U.S. at 459–60; *see Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1115 (9th Cir. 2014) (finding commonality where the class would "rise and fall together" based

41

on whether their evidence—a statistical study—showed disparate impact). It would have been improper for the district court to "decline certification merely because it considers [the Borrowers'] evidence . . . to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof." *Olean Wholesale*, 31 F.4th at 667.

Further, while Martorello appears to argue that the fact that the Borrowers *could* attempt to offer individualized tracing proof renders their claims inappropriate for class certification, he never challenges the district court's conclusion that tracing is ultimately "not how Plaintiffs propose to prove that Martorello received payments on usurious loans." *Williams*, 339 F.R.D. at 62. Moreover, if the Borrowers attempt to rely on individual evidence to establish Martorello's liability, he may move to decertify or modify the class on the basis that the predominance requirement should be reevaluated. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation. For such an order, particularly during the period before any notice is sent to members of the class, is inherently tentative." (cleaned up)).

Therefore, we find that the district court did not misapply Rule 23(b)(3) when rejecting Martorello's second argument against a finding of predominance.

## V.

For the reasons given, we affirm the rulings of the district court.

42

*AFFIRMED*