**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-2097**

_____

LULA WILLIAMS; GLORIA TURNAGE; GEORGE HENGLE; DOWIN COFFY;
MARCELLA P. SINGH, Administrator of the Estate of Felix M. Gillison, Jr., on behalf
of themselves and all individuals similarly situated,

        Plaintiffs – Appellees,

   v.

MATT MARTORELLO,

        Defendant – Appellant,

   and

BIG PICTURE LOANS, LLC; ASCENSION TECHNOLOGIES, INC.; DANIEL
GRAVEL; JAMES WILLIAMS, JR.; GERTRUDE MCGESHICK; SUSAN
MCGESHICK; GIIWEGIIZHIGOOKWAY MARTIN,

        Defendants.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at
Richmond.  Robert E. Payne, Senior District Judge.  (3:17-cv-00461-REP)

_____

Argued:  May 7, 2025                           Decided:  July 16, 2025

_____

Before DIAZ, Chief Judge, and GREGORY and AGEE, Circuit Judges.

_____

Affirmed by published opinion. Judge Agee wrote the opinion in which Chief Judge Diaz
and Judge Gregory join.

**ARGUED:** Steven D. Gordon, HOLLAND & KNIGHT, LLP, Washington, D.C., for Appellant. Matthew W.H. Wessler, GUPTA WESSLER LLP, Washington, D.C., for Appellees. **ON BRIEF:** Kristi C. Kelly, KELLY GUZZO PLC, Fairfax, Virginia; Thomas Scott-Railton, GUPTA WESSLER LLP, Washington, D.C.; Leonard A. Bennett, Craig C. Marchiando, CONSUMER LITIGATION ASSOCIATES, P.C., Newport News, Virginia; Beth E. Terrell, Elizabeth A. Adams, Jennifer R. Murray, TERRELL MARSHALL LAW GROUP PLLC, Seattle, Washington; James W. Speer, VIRGINIA POVERTY LAW CENTER, Richmond, Virginia; John G. Albanese, Eleanor M. Drake, BERGER & MONTAGUE, P.C., Minneapolis, Minnesota; Michael A. Caddell, CADDELL & CHAPMAN, Houston, Texas, for Appellees.

AGEE, Circuit Judge:

This case returns to us for a third time following entry of final judgment against Matt Martorello in the class action lawsuit against him for violating civil provisions of the Racketeering Influenced and Corrupt Organizations Act (RICO). *See* 18 U.S.C. §§ 1962(c)–(d), 1964. Martorello challenges three rulings made by the district court that led to entry of judgment against him. First, he contends the district court abused its discretion in denying his motion to dismiss under Federal Rule of Civil Procedure 19 for failure to join necessary and indispensable parties. Second, he asserts the district court erred in concluding that Virginia, rather than tribal, law applied when determining whether the challenged loans were unlawful. And third, he maintains that the district court erred in rejecting the "mistake of law" defense that he wanted to present to negate what he termed a *scienter* element of a federal civil RICO claim. For the reasons set forth below, we reject each of these challenges and affirm the district court's judgment.

## I.

This case has an extensive history, interspersed with multiple interlocutory appeals and complicated by findings of material misrepresentations by Martorello. To resolve the limited focus of the current issues before the Court, we rely on a bird's-eye description of the underlying facts, which have been more extensively set out in the prior appeals. *See generally Williams v. Big Picture Loans, LLC* (*Williams I*), 929 F.3d 170 (4th Cir. 2019); *Williams v. Martorello* (*Williams II*), 59 F.4th 68 (4th Cir. 2023).

3

Matt Martorello was the architect behind this particular "'Rent-A-Tribe' scheme in which a payday lender partners with a Native American tribe to cloak the lender in the sovereign immunity of the tribe, thereby precluding enforcement of otherwise applicable usury laws that cap interest rates." *Williams II*, 59 F.4th at 73. In this iteration of the scheme, "[t]he Lac Vieux Desert Band of Chippewa Indians (the "Tribe") purportedly created businesses under tribal law to make small-dollar, high-interest rate loans to [the class of Virginia consumers and to other consumers around the country] via the internet." *Id.* When Martorello and the Tribe began operating in January 2012, loans were made through Red Rock Tribal Lending, LLC, but the Tribe—at Martorello's direction—eventually restructured that company into Big Picture Loans, LLC, and Ascension Technologies (collectively "the tribal entities"). *Id.* at 74. Throughout the scheme, including the restructuring, Martorello arranged the lending business so that he "continued to keep almost all the profits . . . while retaining substantial control of the lending operation through" his companies. *Id.* (citation omitted).

In 2017, five Virginia citizens ("the Borrowers") who had obtained payday loans from Red Rock or Big Picture filed a putative class action complaint in the U.S. District Court for the Eastern District of Virginia against Martorello, Big Picture, Ascension, and others, alleging that their enterprise violated federal civil RICO law and seeking damages as relief. The complaint also originally raised other claims—namely, declaratory judgment and state law claims—but those were dismissed earlier in the litigation and are not before us in this appeal.

4

The first interlocutory appeal in this case involved the claims against the tribal entities, and we held that they were arms of the Tribe and thus entitled to tribal sovereign immunity. *Williams I*, 929 F.3d at 185. We reversed the district court's contrary holding and remanded with instructions to grant the tribal entities' motion to dismiss for lack of subject matter jurisdiction. *Id.*

Following our decision in *Williams I*, the parties to this case and others, as well as non-parties with interests in the litigation, engaged in settlement negotiations.[1] Those negotiations resulted in the named plaintiffs (including the Borrowers in this case), acting on behalf of a class of approximately 491,018 individuals, entering into a Class Action Settlement Agreement and Release (the "Settlement Agreement" or "Agreement") with Big Picture, Ascension, individual Tribe members, and others. Although the Tribe itself was not a party to the Agreement, its officials and individual members as well as several of its lending businesses participated in the negotiations. Moreover, potential claims against the Tribe arising from the above-described payday-loan arrangement were part of the negotiated release of claims. *E.g.*, J.A. 305 ("'Released Parties' shall include the Tribe and its current and former Tribal Officials . . . ."); 336 ("The Tribe . . . will not invoke sovereign immunity as a defense to the enforcement of the Settlement Agreement."). Among the many claims that the negotiated Settlement Agreement were designed to "fully,

---

[1] By way of background, this case was not the only one brought by individuals who had obtained loans from the tribal entities and Martorello. At one point, nine cases were pending in the Eastern District of Virginia and across the country relating to the above-described lending arrangement. Generally speaking, they all asserted violations of RICO statutes or state usury laws, among other things, based on the terms of the loans.

5

finally, and forever resolve," were the claims against Big Picture and Ascension that were "pending and dismissed" in this litigation—"*Lula Williams, et al. v. Big Picture Loans, LLC, et al.*, No. 3:17-cv-00461 (E.D. Va.)," J.A. 297. When the district court approved the Settlement Agreement, it too recognized what the plain language of the Settlement Agreement provided: that it would, in relevant part, resolve the claims brought by the Borrowers in this litigation against Big Picture and Ascension. J.A. 377. We recognized the same in *Williams II*. 59 F.4th at 75 n.4.

While those settlement negotiations were underway, this case had been returned to the district court for further proceedings consistent with our prior decision. That meant that the district court followed the Court's instruction to dismiss Big Picture and Ascension from this suit. It also heard argument and received evidence relating to the Borrowers' contention "that Martorello had misrepresented certain facts in an earlier declaration" that it and this Court had relied on when resolving whether the tribal entities were entitled to immunity. *Williams II*, 59 F.4th at 75–76. The court found that Martorello had made material misrepresentations related to how the lending operations worked and, specifically, to the benefits to the Tribe arising from the arrangement. Although the district court "recognized it could not change the immunity issue decided by this Court's prior opinion, it determined that in analyzing all pending and future motions in the litigation, it would consider the misrepresentation findings." *Id.* at 76 (cleaned up). Last, the district court also ruled that the Borrowers "did not waive their right to participate in a class-action suit against" Martorello and then granted class certification. *Id.* (cleaned up).

6

Thereafter, Martorello filed a second interlocutory appeal challenging the district court's finding that he had made material misrepresentations, its ruling that the Borrowers had not waived their right to pursue the class-action litigation against him, and its grant of class certification. We affirmed as to each of these issues and remanded for further appropriate proceedings. *See id.* at 76–92.

Martorello challenges three of the district court's rulings. First, its denial of his motion to dismiss under Rule 19 for lack of necessary and indispensable parties. *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461, 2021 WL 11709552, at *1 (E.D. Va. May 20, 2021). Second, its determination that Virginia (not tribal) law governed the loans. *Williams v. Big Picture Loans, LLC*, 693 F. Supp. 3d 610, 622–24 (E.D. Va. 2023). And third, its rejection of Martorello's argument that he could assert "mistake of law" as a defense to the civil RICO claim. *Id.* at 626–43. In light of these rulings, the parties resolved all remaining issues, largely through Martorello's contingent stipulations to the remaining elements of the federal civil RICO claim. The court consequently granted summary judgment to the Borrowers' certified class and awarded damages in the amount of $43,401,817.47.

Martorello noted a timely appeal, and the Court has jurisdiction under 28 U.S.C. § 1291.

## II.

This appeal is from the district court's denial of Martorello's motion to dismiss and the grant of summary judgment to the Borrowers.

7

We review for abuse of discretion the district court's denial of a motion to dismiss under Federal Rule of Civil Procedure 19. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 250 & n.7 (4th Cir. 2000). In so doing, we review its underlying factual findings for clear error. *Id.*

We review de novo the district court's grant of summary judgment. *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 817 (4th Cir. 1995). This means that we apply the same standard that bound the district court, and summary judgment is warranted "if," viewing the facts in the light most favorable to Martorello, the Borrowers have shown "that there is no genuine issue of material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Sylvia Dev. Corp.*, 48 F.3d at 817.

### III.

While federal RICO law may be more familiar for its "racketeering activity" provisions, it also prohibits individuals from being "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through [the] collection of unlawful debt." 18 U.S.C. § 1962(c). It's also unlawful to conspire to violate that provision. § 1962(d). RICO defines "unlawful debt" to include "a debt . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury" and "which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." *Id.* § 1961(6).

8

At the time of judgment, the only claims remaining against Martorello were the Borrowers' civil RICO claims. Specifically, the Borrowers alleged that Martorello both engaged in and conspired to engage in "the collection of unlawful debt," in violation of § 1962(c) and (d).

### A.  Rule 19 Motion to Dismiss

Martorello argues that the district court abused its discretion in denying his motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(7) and 19 based on the failure and inability to join the Tribe, Big Picture, and Ascension as party defendants. In Martorello's view, these three entities were both necessary and indispensable parties to the litigation and, since they could not be joined due to tribal sovereign immunity, the complaint must be dismissed. The district court denied the motion for three reasons. *See Williams*, 2021 WL 11709552, at *1. First, it relied on the reasoning of several district court decisions that had rejected similar arguments in other rent-a-tribe cases. *Id.* Second, it endorsed the principle that joint tortfeasors are not necessary parties in the context of a civil RICO claim. *Id.* And third, it noted that Rule 19 was inapplicable as to the tribal entities because they had, in fact, been parties to this litigation, but had settled the claims brought against them. *Id.*

Rule 19 sets forth a two-part inquiry. "[A] district court asks first whether the nonjoined party is necessary under Rule 19(a) and then whether the party is indispensable under Rule 19(b)." *Gunvor SA v. Kayablian*, 948 F.3d 214, 218 (4th Cir. 2020). "[I]f the nonjoined party is both necessary and indispensable," then "[d]ismissal, though a drastic remedy that should be employed only sparingly, is required." *Id.* at 219 (cleaned up).

9

Determining whether a non-party is both necessary and indispensable is a fact-specific inquiry that considers various factors relevant to assessing the fairness of proceeding without it. *See* Fed. R. Civ. P. 19(a), (b); *Nat'l Union Fire Ins. Co.*, 210 F.3d at 250 (stating that a district court "must proceed pragmatically, examining the facts of the particular controversy to determine the potential for prejudice to all parties, including those not before it" (cleaned up)). Among the factors courts consider when assessing indispensability are: "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties," "whether a judgment rendered in the person's absence would be adequate," and "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(1), (3), (4). These factors guide courts in their overarching inquiry into whether the case can "in equity and good conscience" proceed without a nonjoined party. Fed. R. Civ. P. 19(b).

Martorello argues that the district court abused its discretion as to both prongs of the Rule 19 analysis. With respect to being necessary parties, Martorello contends that Big Picture and Ascension were both contracting parties to the loans alleged to be usurious, so their rights are at issue in this case. He maintains that because the Tribe owns both companies, it too is a required party with an interest in protecting its sovereign interests in making and enforcing its contract laws, along with a substantial economic interest in the lending practices under review. As for the indispensability of the tribal entities and Tribe, Martorello points to *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), and related cases to assert that the inability to join a necessary party because it is entitled to tribal immunity demonstrates why that nonjoined party can be viewed as indispensable to the

10

litigation under Rule 19(b). He also posits various ways in which the Tribe and its entities may be prejudiced by a judgment entered against him given that he does not represent their interests and they have an interest in the enforceability of the challenged loans. Last, he contends that the Settlement Agreement is irrelevant to the Rule 19 analysis because Rule 19 focuses on the nonjoined parties' interests in the pending litigation, which were unchanged by the Agreement. In addition, Martorello notes that the Tribe was never part of this litigation or a signatory to the Settlement Agreement, and Big Picture and Ascension were dismissed from this case on the basis of immunity, not settlement.

The district court did not abuse its discretion in denying Martorello's motion. At the outset, we are skeptical of his argument that the Tribe or its entities are necessary parties to this action. Civil RICO claims provide plaintiffs with a statutory tort remedy. *Mid Atl. Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 263 (4th Cir. 1994). And it "has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990). That "rule" has led the Supreme Court to recognize that potential joint tortfeasors are not *ipso facto* "necessary" parties under Rule 19(a), meaning that "the threshold requirements" for dismissal under Rule 19 have not been met. *Id.* at 8.[2]

---

[2] Other factors could render a joint tortfeasor "necessary," but those factors do not fall into that category by virtue of joint-tortfeasor status alone. *See, e.g., Home Buyers Warranty Corp. v. Hanna,* 750 F.3d 427, 434 (4th Cir. 2014) ("Although joint tortfeasors from a state court proceeding are not automatically necessary parties to a federal case under Rule 19, the Builders' interest in this case extends even beyond the possibility of tort liability." (citation omitted)).

11

But even assuming that the Tribe or tribal entities were necessary parties, Martorello still has not shown that they were indispensable ones. *See Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005) (observing that the burden of showing that a "person who was not joined is needed for a just adjudication" falls on the person asserting Rule 19 nonjoinder (quoting 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1609 (3d ed. 2001))). Put another way, he has not shown that the district court abused its discretion in concluding, "in equity and good conscience," that this action could proceed in their absence. Fed. R. Civ. P. 19(b). Specifically, Martorello has not shown that the district court abused its discretion in finding that the absence of the Tribe or its entities would prejudice them. That's largely because of the Settlement Agreement, in which Big Rock and Ascension "fully, finally, and forever resolve[d]" the claims that had been brought against them in this very litigation. J.A. 297.

As an initial matter, we reject Martorello's contention that we can sidestep the traditional Rule 19(b) factor-based weighing analysis given the Supreme Court's discussion in *Pimentel*. There, the Supreme Court considered how to apply Rule 19 when two originally named defendants had been dismissed because they were entitled to foreign sovereign immunity. 553 U.S. at 854–55. At the outset of its indispensability analysis, the Court recognized its precedent as holding that "[a] case may not proceed when a required-entity sovereign is not amenable to suit" because "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id.* at 867. In so holding, the Supreme Court impressed that "proper weight" must be given to

12

"compelling claim[s] of sovereign immunity" when considering, under Rule 19(b), the potential prejudice to a non-party with proceeding in the litigation without them. *Id.* at 869.

Since *Pimentel*, some of our sister circuits have interpreted it to mean that when the absent party is a sovereign, there is "very little need" to perform a traditional factor-based inquiry under Rule 19(b), while others roll its implications into considering potential prejudice to the missing party. *Compare Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843, 857 (9th Cir. 2019), *with De Csepel v. Republic of Hungary*, 27 F.4th 736, 749–50 (D.C. Cir. 2022). Martorello urges us to take the former approach, but we need not resolve that open question in this circuit in order to resolve this case. Under either view, *Pimentel*'s driving concern was that "proper weight" be given to the interest of an absent sovereign who was entitled to immunity because proceeding with the case in their absence may prejudice that sovereign's interests. That is not the case here chiefly because of the Settlement Agreement, in which Big Rock and Ascension "fully, finally, and forever resolve[d]" the claims that had been brought against them in this very litigation. J.A. 297.

As our recitation of the procedural history recounted, although Big Rock and Ascension were dismissed from this litigation on account of tribal immunity, that did not end the matter. Despite that action, they elected to enter into a settlement agreement regarding the claims in this and other related cases. All the interests Martorello now purports to assert on their behalf as a reason why they are indispensable to further adjudication of the claim against him—from tribal immunity and the ability of a separate sovereign to contract to the enforceability of the loans at the heart of this case—are matters

13

that the tribal entities have separately resolved to their satisfaction as part of the Settlement Agreement. As a result of the Agreement, the Borrowers have released the tribal entities from any claims arising from these loans. Similarly, the tribal entities have agreed to certain modifications and caps to their loan collections, and they established a settlement fund from which the Borrowers may be eligible for payment. In short, given the terms of the Settlement Agreement, we see no grounds in which a judgment entered solely against Martorello in this case might prejudice the tribal entities. Consequently, the district court did not abuse its discretion in so ruling.

Nor did the district court abuse its discretion in concluding the same as to the Tribe because, although it was not a signatory to the Settlement Agreement, its officials and entities were active participants in the negotiations and its interests have been fully protected and finally resolved by it. Notably, all claims against the Tribe arising from these loans were part of the released claims (though the Tribe did not waive immunity), so—as but one example—the Borrowers could not attempt to sue it as a result of any judgment entered in this case. Further, the Tribe's interests in the loans at the heart of this litigation, either as a sovereign or as a commercial actor, have already been addressed through the Settlement Agreement. Accordingly, the Tribe's absence from this case will in no way prejudice it. Or, to use *Pimentel*'s language, the Settlement Agreement means that there is no colorable "potential for injury to the interests of the absent sovereign" by proceeding with the litigation against Martorello. 553 U.S. at 867. The Borrowers are seeking only

14

monetary damages against Martorello. Such a judgment would have no impact on the Tribe and its entities, nor could it given the terms of the Settlement Agreement.[3]

Last, the district court correctly determined that the Borrowers *would* be prejudiced if this litigation were dismissed for nonjoinder of the Tribe and the tribal entities. That course would leave the Borrowers with no relief against Martorello, the principal participant and conspirator in the lending scheme at the heart of this case. This is not a case where the same claims could be pursued against him, the Tribe, and its entities in another forum. *See, e.g.*, *Nat'l Union Fire Ins. Co.*, 210 F.3d at 253–54 (concluding dismissal would leave the plaintiff with an adequate remedy because the claims could be brought in state court against all the necessary parties). And given the Settlement Agreement, all that could ever proceed are claims against Martorello.

For all these reasons, the equities in this case are not at all as Martorello portrays them. The Tribe and its entities are not indispensable parties, and the extreme remedy of dismissal for nonjoinder under Rule 19 was not warranted. Consequently, the district court did not abuse its discretion in denying Martorello's motion. *Gunvor SA*, 948 F.3d at 219 (reiterating that dismissal is required only when a nonjoined person is both necessary *and* indispensable).

## B.  Applicability of Virginia Law

Next, Martorello asserts that the district court erred in relying on Virginia, not tribal, law to assess whether the challenged lending practices involved the collection of unlawful

---

[3] While prejudice to Martorello would also be an appropriate Rule 19(b) inquiry, he has not argued that the absence of the Tribe or its entities would somehow prejudice him.

15

debt. He argues that applying Virginia's usury laws to tribal lending practices violates the Indian Commerce Clause because tribal law is subordinate to only federal, not state, law. He maintains that the district court should have applied the test set out in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), to identify the federal, tribal, and state interests at stake before deciding what usury laws apply to the Tribe's online lending practices. And he contends that, had the district court undertaken the proper *Bracker* analysis, it would have concluded that tribal interests in offering a *bona fide* commercial product such as the loans at issue here precluded application of state law.

The Indian Commerce Clause grants Congress—not the States—the power "[t]o regulate Commerce . . . with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "This congressional authority and the 'semi-independent position' of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." *Bracker*, 448 U.S. at 142. "First, the exercise of such authority may be pre[]empted by federal law." *Id.* "Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.'" *Id.* (quoting *Willams v. Lee*, 358 U.S. 217, 220 (1959)). Because tribal sovereignty "is dependent on, and subordinate to, only the Federal Government, not the States," "state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987) (quoting *Washington v. Confederated Tribes of Colville Indian Rsrv.*, 447 U.S. 135, 154 (1980)). And since "the question [of] whether a particular state law may be applied to an Indian reservation or to tribal members" involves a complex analysis of tribal, federal, and

16

state interests, "no rigid rule" exists to resolve it. *Bracker*, 448 U.S. at 142. Instead, in *Bracker*, the Supreme Court articulated a broad set of general principles to help courts frame and perform the requisite analysis. *See id.* at 143–45.

Consistent with *Bracker* and its framework, however, is the long-held recognition that, "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973) (collecting cases); *accord Bracker*, 448 U.S. at 144 n.11. Thus, it is entirely consonant with the Indian Commerce Clause, tribal sovereignty, and *Bracker* to recognize that state laws are generally enforceable against tribal entities for activities they undertake off the reservation.

We recognized this distinction in *Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021), when we held that a tribe operates off the reservation when it engages in online lending activities with non-Indians such that those activities are subject to non-discriminatory state laws. In *Hengle*, the defendant tribal officials had argued that their online lending practices occurred on the reservation because they and the tribal lending entities were located on the reservation and each loan agreement said it was "made and accepted" on the reservation. *Id.* at 348. We rejected that argument after observing that the challenged conduct was not limited to where the loan agreements were "made and accepted." *Id.* Instead, looking at the totality of the circumstances, we concluded that the defendants' online lending activities occurred off the reservation because they marketed online lending throughout the country, plaintiffs resided off the reservation when they applied for the loans, the tribal officials and

17

entities collected loan payments from off-reservation bank accounts while plaintiffs continued to reside off the reservation, and the effects of the challenged conduct were felt by plaintiffs off the reservation. *Id.* at 348–49.

The district court did not err in relying on *Hengle* and the other principles recounted above to conclude that Virginia law applies to the transactions at issue without running afoul of the Indian Commerce Clause or *Bracker*. Contrary to Martorello's contention, a *Bracker* analysis was not required under the circumstances presented here because that analysis aids courts in determining when state laws can be applied to a tribe's conduct on a reservation or toward its own members. *See Bracker*, 448 U.S. at 141–42. Neither of those scenarios is implicated in this case. The Tribe's online lending activities—like those of the tribal officials at issue in *Hengle*—were broadly marketed online and in direct mailings to consumers. The Borrowers lived off the reservation when they applied for and made payments under the loans. The effect of the challenged conduct was also felt off the reservation through collection and other actions. And the Borrowers are not Tribe members. Under *Hengle* and the Supreme Court precedent cited there and earlier in this opinion, a *Bracker* analysis would not have been appropriate as Martorello's challenged conduct was clearly part of the Tribe's "off-reservation conduct subject to nondiscriminatory state regulation." *Hengle*, 19 F.4th at 349 (quoting *Hengle v. Asner*, 433 F. Supp. 3d 825, 876 (E.D. Va. 2020)).

For these reasons, we reject Martorello's contention that the loans at issue here constitute on-reservation conduct to which the *Bracker* analysis applies. The district court therefore did not err in applying Virginia law.

18

## C. Mistake-of-Law Defense

Martorello challenges the district court's ruling that he could not assert a mistake-of-law defense to the Borrowers' civil RICO claims. To understand his argument first requires some background discussion about those claims and the type of defense Martorello wanted to present.

In the district court and now, Martorello argued that, to prove their claims, the Borrowers needed to show that he willfully collected an unlawful debt, i.e., that he (a) knew that the loans charged interest in an amount that would be "unenforceable under State or Federal law . . . because of the laws relating to usury" and (b) knowingly lent money "at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). Martorello argues that he should be able to tender evidence that he acted under the good-faith (but ultimately incorrect) belief that the loans at issue were not "unlawful" because he believed them to be governed by tribal law, which permitted the high interest rates charged. If he was merely mistaken about the governing law, his argument goes, he lacked the requisite *mens rea* to be held liable for a civil RICO violation.

The Borrowers moved for summary judgment and asserted that such a mistake-of-law defense was not available as a defense to their civil RICO claims. The district court agreed with the Borrowers after concluding that a civil RICO claim (and its attendant conspiracy claim) did not require proof that Martorello possessed a particular *mens rea*. *Williams*, 693 F. Supp. 3d at 626–43. And because the underlying act—violation of Virginia's usury laws—did not require a specific *mens rea* either, this meant in essence

19

that evidence relating to a mistake-of-law defense would be legally irrelevant at any forthcoming trial on the substantive and conspiracy civil RICO claims.[4]

At the outset, the district court held that the premise underlying Martorello's defense was erroneous because a civil RICO claim did not require proof of the defendant's *mens rea* separate and apart from any *mens rea* required by the predicate acts (i.e., whatever laws were relied on as the "racketeering activity" or "collection of unlawful debt"). In so holding, the court relied on the statutory language, the standard jury instructions for a civil RICO claim, the differences between civil and criminal claims generally and between civil and criminal RICO claims specifically, the persuasiveness of other court decisions related to this question, and the elements of the underlying Virginia usury laws. *Id.* at 630–41. The court further determined that all that a civil RICO claim required the Borrowers to prove was that "Martorello . . . knowingly engage[d] in the activity itself, but [not that he knew] that, by doing so, he would break the law." *Id.* at 641. Accordingly, it concluded that Martorello's proposed mistake-of-law defense would not be probative of any aspect of the civil RICO claims against him. In light of these conclusions, the court held that Martorello's proposed defense had no bearing on whether he committed a substantive civil RICO violation, or conspired to do so.

We agree with the district court that a mistake-of-law defense would not negate any element of the Borrowers' civil RICO claims. Our understanding begins with the statutory

---

[4] Martorello does not challenge the district court's interpretation of Virginia's usury statute, Va. Code § 6.2-303(A). Accordingly, the only issue before us on appeal is whether a federal civil RICO claim contains a *mens rea* requirement separate from the underlying violation of state law.

20

language pertaining to a RICO violation found in 18 U.S.C. § 1962. In relevant part, § 1962(c)'s substantive RICO violation requires proof of the "collection of an unlawful debt." And § 1961(6) defines "unlawful debt" to be a debt that is "unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury" and that was "incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." This statutory language has no requirement that the defendant knew that the debt being collected was "unlawful." Our interpretation of the statutory language is consistent with that of the other circuit courts of appeals to recognize that § 1962 "on its face is silent on the issue of *mens rea*." *United States v. Scotto*, 641 F.2d 47, 55 (2d Cir. 1980); *accord United States v. Blinder*, 10 F.3d 1468, 1477 (9th Cir. 1993); *Genty v. Resol. Tr. Corp.*, 937 F.2d 899, 908 (3d Cir. 1991); *United States v. Pepe*, 747 F.2d 632, 675–76 (11th Cir. 1984).

Courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997). Consistent with that principle and in light of § 1962's silence, several courts of appeals have stated even in the context of criminal RICO convictions that § 1962 "imposes no additional mens rea requirement beyond that found in the predicate crimes." *United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986); *Pepe*, 747 F.2d at 675–76; *see also Genty*, 937 F.2d at 908 (assuming the

same for purposes of a civil RICO claim). Nothing in § 1962 itself suggests that Congress intended to require a specific *mens rea*.[5]

Martorello acknowledges that § 1962 itself does not expressly require proof of a particular *mens rea*. Instead, he contends that such an element should be implied based on general principles of criminal law, which he contends are relevant to understanding § 1962 because violations of RICO can carry either criminal or civil penalties. He relies on the principle that, when interpreting criminal statutes, courts will usually read a *mens rea* requirement into a statute when it is otherwise silent, absent evidence that Congress intended otherwise. That concept derives from the common law presumption that criminal defendants must be shown to have "possess[ed] a culpable mental state." *Ruan v. United States*, 597 U.S. 450, 458 (2022) (quoting *Rehaif v. United States*, 588 U.S. 225, 229 (2019)); *see Staples v. United States*, 511 U.S. 600, 605–06 (1994) ("[T]he common-law rule requiring *mens rea* has been followed in regard to statutory crimes even where the statutory definition did not in terms include it." (quoting *United States v. Balint*, 258 U.S. 250, 251–52 (1922))). But no such analogous presumption exists in the civil context. Indeed, this principle is itself a narrow, though longstanding, exception to the more "common maxim" followed in the American legal tradition "that ignorance of the law will not excuse any person, either civilly or criminally." *Jerman v. Carlisle, McNellie, Rini,*

---

[5] In addition, and as the district court noted, the model jury instructions relating to civil RICO violations do not "mention that willfulness is an element to be proved" to establish a violation under § 1962(c). *Williams*, 693 F. Supp.3d at 631; *accord Modern Federal Jury Instructions (Civil)*, § 84-23. And nothing in the scholarly discussions of a civil RICO conspiracy's elements contains a "willfulness" component either.

22

*Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quoting *Barlow v. United States*, 32 U.S. 404, 411 (1833) (opinion for the Court by Story, J.)); *Cheek v. United States*, 498 U.S. 192, 199 (1991) (reiterating the "general rule" that "ignorance of the law or a mistake of law is no defense"). Thus, whatever circumstances may give rise to an implied *mens rea* requirement before obtaining a criminal conviction have no footing in the civil context.

Further supporting our understanding of the elements of a civil RICO claim, we note that when Congress has intended for civil liability to be based on proof that a defendant acted with knowledge that his conduct violated the law, it has used language expressly calling for such proof. The Supreme Court has, for example, generally understood Congress's use of the word "willful" when discussing a defendant's conduct to express its intent to "excuse mistakes of law." *Jerman*, 559 U.S. at 584 (citing cases). But when Congress uses language that falls short of such an explicit requirement, then civil liability may attach "even if the actor lacked actual knowledge that her conduct violated the law." *Id.* at 582–83.[6] In short, Congress knows how to demand proof of actual knowledge of unlawfulness when crafting civil statutes. But Congress refrained from including such language in § 1962, and this absence matters for purposes of understanding what a plaintiff must prove to establish a civil RICO violation.

---

[6] In *Jerman*, for example, the Supreme Court observed that Congress had "intended to provide a mistake-of-law defense to civil liability" in the Fair Debt Collection Practice Act when it incorporated by reference regulations that explicitly limited liability to when a "debt collector acts with actual knowledge or knowledge fairly implied on the basis of objective circumstances that its action was prohibited by the FDCPA." 559 U.S. at 583–84 (cleaned up).

23

To reiterate, the distinction between the civil and criminal contexts effectively ends our inquiry. Civil claims need not have a *mens rea* element, § 1962 does not expressly provide for one as part of what constitutes a substantive RICO violation or a conspiracy to commit such a violation, and we have no basis for implying such a requirement from statutory silence when § 1962 is used as the basis for establishing a civil RICO claim under § 1964. In the absence of such an element, Martorello's purported belief that the loans at issue were lawful is simply irrelevant for purposes of establishing (or defending against) his civil RICO violation.

As noted, Martorello resists this conclusion by arguing that we should read § 1962 in tandem with §§ 1963 and 1964 to implicitly require proof of a specific *mens rea* as part of establishing every RICO violation under § 1962, regardless of whether it results in civil or criminal liability.

We disagree with Martorello's novel position. No circuit court of appeals has adopted this understanding of how the RICO statutes operate.[7] And even assuming that a *mens rea* requirement should be implied to obtain some criminal RICO convictions, it does not follow that such a requirement exists in a civil RICO claim. This is not a case like those

---

[7] Lacking direct support for his position in the case law, Martorello points to dicta in criminal cases arising in the Second Circuit. In a handful of cases, and as recently articulated in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020), that court has pondered whether the absence of a *mens rea* requirement for usury-based RICO violations could result in a criminal conviction without any findings as to the defendant's *mens rea*. *Id.* at 117–21. This speculative dicta arose only in the context of what might be necessary to obtain a *criminal* RICO conviction, and thus is far removed from what a plaintiff must prove about § 1962(c) and (d) to establish *civil* liability for a RICO violation under § 1964. *See id.*

24

Martorello relies on where we must interpret existing statutory language in a way that will be applied in both civil and criminal contexts. *See, e.g.*, *Sessions v. Dimaya*, 584 U.S. 148, 164 (2018) (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 12 n.8 (2004)). Instead, he urges that we infer the existence of an unstated and entirely new element into the statute. As noted above, other circuit courts have not required a separate showing of *mens rea* beyond what the predicate acts require in the criminal context. They have held as much despite the presumption that arises in the criminal context that some *mens rea* should be found to support a conviction. No similar presumption of *mens rea* exists in the civil context and Congress has not included express language that would require a *mens rea* finding to establish a civil RICO claim.[8]

In the end, a civil RICO claim does not hinge on evidence of the defendant's *mens rea* apart from whatever requirements the predicate acts impose. Here, it is unchallenged that Virginia's usury laws impose no such *mens rea* requirement. Consequently, the Borrowers did not have to establish that Martorello acted willfully, i.e., that he knew that the loans would be subject to Virginia law or that their terms violated Virginia's usury

---

[8] We find additional support for our conclusion in *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978). Like the RICO statutes, the antitrust statutes authorize "[b]oth civil remedies and criminal sanctions . . . with regard to the same generalized definitions of the conduct proscribed . . . without reference to or mention of intent or state of mind." *Id.* at 438. Even so, *Gypsum* held that proof of *mens rea* was required for a criminal violation of the Sherman Act. *Id.* at 435. But its decision "le[ft] unchanged the general rule that a civil violation [of the antitrust laws] can be established by proof of . . . an anticompetitive effect"—in other words, without proof of intent. *Id.* at 436 n.13. Though the same proscribed conduct could give rise to civil or criminal liability under the antitrust laws, the presumption against strict liability crimes and the rule of lenity prompted a *mens rea* requirement for a criminal antitrust violation, *id.* at 436–38, but not for a civil one.

25

laws. Evidence relating to a mistake-of-law defense would therefore be irrelevant to establishing the Borrowers' civil RICO claim against Martorello, and the district court did not err in disallowing the defense as part of its summary judgment ruling.

## IV.

For the reasons set forth above, we affirm the judgment of the district court in favor of the Borrowers.

*AFFIRMED*

26